UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| DISH NETWORK L.L.C., | ) | No. 2:24-cv-01683 |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF'S COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| VIRTUAL SYSTEMS, LLC and | ) | |
| VYACHESLAV SMYRNOV, | ) | |
| | ) | |
| Defendants. | ) | |

**Nature of the Action**

1. Plaintiff DISH Network L.L.C. ("DISH") is one of the largest pay-tv providers in the United States and has millions of subscribers nationwide. This case concerns the infringement of DISH's copyrights in programming ("Works") that aired on 23 international channels that DISH exclusively licensed for transmission in the United States ("Channels").

2. DISH's copyrights in the Works were directly infringed because, without DISH's authorization, the Works were transmitted on pirate streaming services ("Pirate Services") to users of those services in the United States ("Users"). The Pirate Services depend on hosting providers to lease them the servers and network needed to transmit the Works over the internet to their Users.

3. Defendant Virtual Systems, LLC ("Virtual Systems") materially contributed to and induced the Pirate Services' direct infringement of the Works by providing the servers and network

that the Pirate Services used to transmit the Works, including servers in Virtual Systems' Seattle data center. Virtual Systems openly advertises that it does not comply with United States copyright law and does not require its customers, such as the Pirate Services, to abide by such law.

4. Virtual Systems knew that the Pirate Services were infringing the Works because, on hundreds of occasions, DISH asked Virtual Systems to stop this specific infringement that was taking place on its servers and network. Virtual Systems could have taken simple measures to stop the infringement – such as removing or disabling the infringing streams or terminating the Pirate Services' accounts because of their repeated infringement – but Virtual Systems refused to take such measures and elected to continue profiting from the Pirate Services' direct infringement.

5. Virtual Systems is liable for contributory and vicarious copyright infringement. Its owner and CEO, Defendant Vyacheslav Smyrnov ("Smyrnov"), is also personally liable because he authorized, directed, and participated in Virtual Systems' infringement, including by managing the servers and network the Pirate Services used to infringe the Works and, despite DISH notifying him of this infringement, failing to exercise his ability to stop it.

**Parties**

6. Plaintiff DISH is a limited liability company organized under Colorado law, with its principal place of business at 9601 South Meridian Blvd., Englewood, Colorado 80112.

7. Defendant Virtual Systems is a limited liability company organized under Ukraine law, with its principal place of business at 33/37 Laboratorna St., Kyiv, Ukraine.

8. Defendant Smyrnov is an individual believed to reside at 1V Vadyma Hetmana St., Apt. 46, Kyiv, Ukraine.

**Jurisdiction and Venue**

9. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1400 because DISH asserts claims under the Copyright Act, 17 U.S.C. § 101 *et seq*.

10. The Court has personal jurisdiction over Virtual Systems pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because Virtual Systems committed infringing acts in Washington,

including through its operation of a data center and servers in the Seattle area with which it contributes or contributed to the Pirate Services' infringement of the Works.[1] Virtual Systems did not stop the infringement taking place from its Seattle data center and servers when notified of that infringement. DISH was harmed in Washington because at least part of Virtual Systems' infringing conduct occurred there, damaging the value of DISH's exclusive copyrights, and because, on information and belief, the Works were transmitted to Users in Washington that avoided paying subscription fees to DISH.



11. The Court, alternatively, has personal jurisdiction over Virtual Systems pursuant to Federal Rule of Civil Procedure 4(k)(2), to the extent there is an insufficient basis to exercise personal jurisdiction in Washington under Rule 4(k)(1)(A). Virtual Systems identifies Washington as the only location from which it operates in the United States and therefore, on information and belief, it is not subject to personal jurisdiction in any other state's courts of general jurisdiction.

12. Virtual Systems has sufficient contacts with the United States to support personal jurisdiction under Rule 4(k)(2) that include, in addition to its data center and servers in Seattle, a marketing campaign directed towards streaming services seeking to provide infringing content to a United States audience while avoiding the implications of United States copyright law, such as the Pirate Services. DISH was harmed in the United States for the reasons identified above, and

---

[1] https://vsys.host/ (image of data center map below). On information and belief, Virtual Systems' Seattle-area data center is located at 3355 South 120th Place, Tukwila, Washington. Website URLs identified in this complaint were last visited on or after September 6, 2024.

that harm is amplified because, on information and belief, the Works were infringed throughout the United States and Users nationwide avoided paying subscription fees to DISH. DISH was also harmed in the United States because it is a United States company and holds the copyrights at issue only for the United States.

13. The Court has personal jurisdiction over Smyrnov pursuant to Rule 4(k)(1)(A), or alternatively Rule 4(k)(2), because Smyrnov is a primary participant in Virtual Systems' infringing conduct or had control of and at least direct participation in such activities. Smyrnov is the owner, director, and CEO of Virtual Systems. Smyrnov identifies his primary responsibilities at Virtual Systems to include "[m]anaging network and server equipment" and a "department of 10 people."[2] Smyrnov was personally notified of the infringement of the Works taking place on the network and servers that he managed, but he failed to stop the infringement. Smyrnov financially benefitted from that infringement as owner, director, and CEO of Virtual Systems.

14. The Court's exercise of personal jurisdiction over Virtual Systems and Smyrnov, whether pursuant to Rule 4(k)(1)(A) or 4(k)(2), is reasonable and consistent with the United States Constitution and United States law because their purposeful interjection into Washington and the United States is substantial, the burden of them having to defend in this Court is minimal, and this Court is the most appropriate forum to decide this case. Virtual Systems, in addition to its Seattle data center and advertising that targets the United States, uses United States companies to support its business and promote its services, including Facebook, Twitter/X, LinkedIn, Reddit, YouTube, GitHub, and Public Domain Registry through which its website is registered. Virtual Systems is an established company that generates tens of millions of dollars in revenues annually. The United States has an interest in having its copyright laws enforced in its federal courts, while DISH has an interest in protecting itself in a United States federal court, perhaps the only forum where DISH can enforce its United States copyrights for infringement that occurred in the United States.

---

[2] https://www.linkedin.com/in/slavikbutch/?originalSubdomain=ua

15. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to DISH's claims occurred in this district; under § 1391(b)(3) because Virtual Systems and Smyrnov are each subject to personal jurisdiction in this district; and under § 1391(c)(3) because as nonresidents of the United States they may be sued in any district. Venue is also proper under 28 U.S.C. § 1400(a) because the case involves Copyright Act violations.

### DISH's Copyrights

16. DISH provides the Channels to its subscribers pursuant to agreements that it entered into with the Channels' owners or their agents ("Networks"). The Networks and Channels include: B4U U.S., Inc. (*B4U Movies*); Bennett, Coleman and Company Limited (*Times Now* and *Zoom*); GloboSat Entertainment LLC (*Sahara One* and *Sahara Samay*); International Media Distribution (Luxembourg) S.A.R.L. (*Al Hayah 1, ART Aflam 1, ART Aflam 2, ART Cima, Hekayat, LBC, LBCI,* and *Rotana America*); MSM Asia Limited (*SET, SET MAX,* and *SAB*); Soundview ATN LLC (*ATN Bangla*); Soundview Broadcasting, L.L.C. (*ATN News* and *NTV Bangla*); and World Span Media Consulting, Inc. (*CBC, CBC Drama, Melody Aflam,* and *Melody Classic*).

17. The Networks acquire copyrights in the Works that air on their respective Channels, including by producing the Works and by assignment. The copyrighted material includes Works registered with the United States Copyright Office and additional unregistered Works.[3] Several of the Works involve series, for which each episode constitutes a separate copyrighted Work.

18. DISH entered into signed, written licensing agreements with the Networks granting DISH the exclusive right to distribute and publicly perform the Works that air on the Channels in the United States, by means that include satellite, over-the-top (OTT), internet protocol television (IPTV), and internet.

19. DISH's exclusive rights to distribute and publicly perform the Works were in effect when the Pirate Services transmitted them through Virtual Systems' servers and network. DISH's

---

[3] Exhibit 1 (illustrative list of Works subject to registration) and Exhibit 2 (illustrative list of unregistered Works).

exclusive distribution and public performance rights remain in effect with respect to Works aired on many of the Channels.

### The Pirate Services' Infringement

20. Digital video piracy was found to cause the United States economy to lose at least $29.2 billion in revenue each year, with more than 80% of this piracy being attributable to illegal streaming services such as the Pirate Services.[4] The Pirate Services were able to provide Users thousands of channels, and tens of thousands of video-on-demand (VOD) programs, at a fraction of the cost charged by legal providers such as DISH, at least in part, because the Pirate Services did not pay fees to license the content they provide.

21. The Pirate Services transmitted the Works to Users over the internet using Virtual Systems' servers and network as part of linear streams of the Channels or on a VOD basis. Users accessed the Works through a set-top box (STB) or a website that links to the Works or provides a playlist used to access the Works. Users often had to purchase a subscription to view the Pirate Services' content, in addition to purchasing any required STB. DISH did not authorize the Pirate Services to distribute or publicly perform the Works and received no compensation from them.

22. The Pirate Services largely conducted their infringing businesses over the internet and engaged in efforts to disguise the true identities of their operators. On information and belief, most of the Pirate Services were operated by infringers located outside the United States. For this complaint, the Pirate Services are identified by one or more IP addresses associated with Virtual Systems' servers and network from which the Works were transmitted, along with any domain name incorporated in the URL that was used in transmitting the Works and any STB that was used in accessing them, which forms an illustrative list of Pirate Services that used Virtual Systems' servers and network to directly infringe DISH's copyrights.[5]

---

[4] Global Intellectual Property Center, Impacts of Digital Piracy on the United States Economy (June 2019), available at https://www.uschamber.com/assets/documents/Digital_Video_Piracy_June_2019.pdf.
[5] Exhibit 3 (illustrative list of Pirate Services).

Plaintiff's Complaint          6          Preg O'Donnell & Gillett PLLC
                                           401 Union Street, Suite 1900
                                           Seattle, Washington 98101
                                           (206) 287-1775

23. The scale of the Pirate Services' direct infringement of the Works is extensive. The Pirate Services that transmitted linear streams of the Channels that aired the Works often did so 24 hours per day and 7 days per week, in some cases for several years, meaning these Pirate Services alone infringed a substantial number of Works. The Pirate Services that transmitted the Works on a VOD basis add to this already significant amount of infringement.

24. The Pirate Services were notified of their infringement multiple times but have not stopped infringing DISH's copyrights. DISH was awarded a judgment and permanent injunction against parties located abroad that were involved in operating at least three of the Pirate Services, but even that has proven ineffective in stopping their infringement. After being enjoined, one Pirate Service moved its transmissions of the Channels that aired the Works to Virtual Systems' servers and network, where the infringement of DISH's copyrights is not only tolerated but encouraged.[6] The other two Pirate Services were using Virtual Systems' servers and network to infringe DISH's copyrights around the time the lawsuits were filed and continued doing so, despite being enjoined.[7] Residing outside the United States, and having no assets in the United States, the Pirate Services have little incentive to comply with infringement notices or United States court orders.

**Virtual Systems' End-to-End Streaming Solutions**

25. Virtual Systems operates data centers located in Seattle, Ukraine, the Netherlands, and Singapore, using "only its own hardware and network equipment."[8] Virtual Systems stresses this control when describing its Seattle data center, stating "we aren't reselling dedicated servers in the USA – we provide our own hardware and network equipment."[9]

26. Virtual Systems provides its customers with various types of dedicated servers and partially dedicated servers (referred to as virtual private servers or VPS) to transmit content over the internet. Virtual Systems states "that the very success of streaming businesses depends on their

---

[6] *DISH Network L.L.C. v. Lool Tech Co.*, No. 4:16-cv-01771 (S.D. Tex.).
[7] *DISH Network L.L.C. v. Alghafir*, No. 4:20-cv-01678 (S.D. Tex.); *DISH Network L.L.C. v. 786 Wireless World, Inc.*, No. 21-cv-05730 (E.D.N.Y.).
[8] https://vsys.host/
[9] https://vsys.host/dedicated-servers-usa

Plaintiff's Complaint    7    Preg O'Donnell & Gillett PLLC
401 Union Street, Suite 1900
Seattle, Washington 98101
(206) 287-1775

ability to deliver media-intensive services paired with minimum latency" and that Virtual Systems' "servers provide enough bandwidth, memory, and storage resources you need to meet that goal."[10] Virtual Systems charges customers to use its servers and network based upon options the customer selects, including the server features and the data center where the server is located.

27. Virtual Systems also provides its customers, for an additional cost, storage servers ("an excellent solution for stocking lots of videos"),[11] GPU servers ("a perfect tool for encoding and decoding video files or streams in real time"),[12] and Xtream-UI middleware (a software service that enables customers "to manage their IPTV and VOD service and customer database").[13] Virtual Systems encourages customers to combine these offerings and take advantage of this end-to-end streaming solution because "it's convenient[,] cost-effective," and "fast to transfer data" because "all your servers are in the same super-fast network."[14]

28. Virtual Systems takes a hands-on approach to operating its servers and network, stating that "[o]ur teams develop, install, and manage our dedicated servers in the USA" and "we continually check US dedicated servers['] health and the environment."[15] Virtual Systems also states that "only highly qualified specialists can access US dedicated server hardware and network equipment" and offers to have its "courteous and educated team . . . help you with any dedicated hosting USA concerns."[16] Virtual Systems makes similar statements concerning its active role in operating the servers located in its data centers outside the United States.[17]

29. Virtual Systems markets its Seattle servers as "a perfect choice for anyone . . . with a North American audience," stating that "[o]ur data center is directly linked to the major internet routes in the United States, allowing for fast data transfers."[18] Virtual Systems' data center in

---

[10] https://vsys.host/streaming-servers
[11] *Id.*
[12] *Id.*
[13] https://vsys.host/xtreme-codes-panel-saas
[14] https://vsys.host/streaming-servers
[15] https://vsys.host/dedicated-servers-usa
[16] *Id.*
[17] https://vsys.host/dedicated-server-hosting; https://vsys.host/dedicated-servers-netherlands
[18] https://vsys.host/dedicated-servers-usa

Ukraine is similarly advertised as providing "[e]xcellent connectivity to the East Coast of the US[,] . . . built to get the lowest latency and zero-loss network routes."[19] Virtual Systems' data center in the Netherlands is said to offer "an unprecedented rate of overall connectivity to the US."[20] Virtual Systems promotes its servers and network as "tasty for streaming services" and states that "large IPTV streaming projects and adult tube sites are more than welcome here."[21]

30. Virtual Systems provided the Pirate Services the servers and network that were used to transmit the Works to Users, which included servers in Virtual Systems' data centers located in Seattle, Ukraine, and the Netherlands. Virtual Systems may have also provided the Pirate Services additional servers and services used in transmitting the Works, such as the storage servers, video encoding servers, and Xtream-UI middleware identified above.

### Virtual Systems' "DMCA Ignored" Policy

31. Virtual Systems appeals to streaming services that violate United States copyright law, such as the Pirates Services, with its "DMCA Ignored" policy, under which Virtual Systems states that "we ignore DMCA takedown notices" concerning servers in its Ukraine data center and therefore customers "[e]njoy full protection against DMCA takedown notices."[22] Virtual Systems promotes its servers in Seattle and the Netherlands similarly, stating "all DMCA notices we receive are processed by our legal team, but we do act courteously towards our valued clients, who might be having occasional issues with copyrights."[23]

---

[19] https://vsys.host/streaming-servers; https://vsys.host/dmca-ignored-dedicated-server
[20] https://vsys.host/10gbps-servers
[21] https://vsys.host/20gbps-servers; https://vsys.host/streaming-servers
[22] https://vsys.host/dmca-ignored-dedicated-server (partial image of webpage below).
[23] https://vsys.host/10gbps-servers



32.     Virtual Systems advertises that its "DMCA Ignored" policy extends to take down notices concerning its storage servers ("We ignore DMCA dismissal unless the conditions of the situation force us to")[24] and Xtream-UI middleware ("We do not react to DMCA shutdown notices and redirect such notices to the client unless the situation conditions force us to").[25]

33.     Virtual Systems and Smyrnov were sent written notices asking that they remove or disable access to Works that the Pirate Services were transmitting from Virtual Systems' servers and network, thereby infringing DISH's copyrights ("Infringement Notices"). On information and belief, the Infringement Notices were received because they were delivered by mail and email to valid addresses used by Virtual Systems and Smyrnov. Virtual Systems and Smyrnov, collectively, were the recipients of at least 512 Infringement Notices. Virtual Systems and Smyrnov received additional notices concerning infringements of Works by customers other than the Pirate Services.

34.     The Infringement Notices complied with the Digital Millennium Copyright Act, 17 U.S.C. § 512. The Infringement Notices contained, among other things, information reasonably sufficient for Virtual Systems to locate the infringing material, including the IP address associated

---

[24] https://vsys.host/storage-servers
[25] https://vsys.host/xtreme-codes-panel-saas

with Virtual Systems' server from which the material was transmitted or the URL of the infringing transmission. Virtual Systems was sent Infringement Notices regarding the Channels on which the Works aired, prior to the Pirate Services transmitting the Works.

35. Virtual Systems did not respond to the Infringement Notices and did not take any measures to stop the Pirate Services' infringement occurring on its servers and network. The Pirate Services kept infringing DISH's copyrights in Works aired on the Channels, even using the same IP addresses and URLs previously reported to Virtual Systems. Virtual Systems acted true to its "DMCA Ignored" policy by disregarding the Infringement Notices and turning a blind eye to the Pirate Services' infringement of DISH's copyrights.

36. Virtual Systems also did not comply with orders from United States courts, entered in lawsuits involving three of the Pirate Services, that permanently enjoined Virtual Systems from providing its servers and network to those Pirate Services because they were using them to infringe DISH's copyrights.[26] Two court orders specifically identified Virtual Systems as being enjoined, while a third court order enjoined Virtual Systems by virtue of its role in providing the servers and network used in the infringement. Virtual Systems was notified of the permanent injunctions but did not cease providing its servers and network to the Pirate Services, which continued infringing DISH's copyrights, including its copyrights in the Works.

37. Virtual Systems is not entitled to assert any DMCA safe harbor defense because it does not adopt and reasonably implement a policy that provides for the termination of its services to repeat infringers. Virtual Systems is also not entitled to assert most DMCA safe harbor defenses because it does not have a designated DMCA agent to receive infringement notices; because when such notices are received or it otherwise has knowledge of infringement, Virtual Systems does not respond expeditiously to remove or disable access to the infringing material; and because Virtual Systems receives financial benefits directly attributable to infringement that is under its control.

---

[26] Footnotes 6-7 (identifying cases).

**Virtual Systems' "Under The Radar" Policy**

38.     Virtual Systems also encourages the Pirate Services to infringe DISH's copyrights by keeping their identities anonymous. Virtual Systems informs its customers that "[y]our profile is always kept under the radar" and "[s]ince our knowledge of you is kept to a minimum, your anonymity is guaranteed."[27] Virtual Systems touts that it does not comply with KYC (Know Your Customer) requirements, stating that "we do not require personal data to make a purchase."[28] And Virtual Systems states that it will communicate with its customers "via anonymous e-mail" and it "do[es] not save any records."[29]

39.     Virtual Systems also encourages customers to keep their identifies undiscoverable by paying with cryptocurrency, stating that "we do love and accept cryptocurrencies" and that such payments "may be made anonymously."[30] Virtual Systems advises customers to "[t]ake comfort in the fact that you are completely protected here if your personal privacy is a top priority."[31]

[screenshot of Virtual Systems webpage advertising "USA DEDICATED SERVERS – CHOOSE THE BEST ONE FOR YOUR BUSINESS" with features: Customizable Network / VLAN / vRACK; Privacy Driven Crypto Friendly & Totally Anonymous US Dedicated Server Hosting; Round-The-Clock Pro Level Tech Support; Instant Deployment and Migration Assistance; Low-Latency, Zero Packet Loss & Saturation – 99,9 % Uptime Guaranteed]

---

[27] https://vsys.host/
[28] https://vsys.host/10gbps-servers
[29] https://www.linkedin.com/company/vsyshost; https://vsys.host/vps-usa
[30] https://vsys.host/dedicated-servers-usa (partial image of webpage below); https://vsys.host/vps-usa
[31] https://vsys.host/vps-usa

**Virtual Systems' Control Over the Infringement**

40. Virtual Systems could have taken simple measures to stop the Pirate Services from infringing the Works but refused to take them. Virtual Systems could have determined whether the Pirate Services were legally authorized to transmit the Works by first requiring them to verify their rights in the Channels. Virtual Systems also could have removed or disabled access to the particular material identified in the Infringement Notices that was transmitted from its servers and network. Virtual Systems could have implemented a multi-strike policy, such as by temporarily suspending a Pirate Services' account on receipt of one notice advising of infringement against that account and then permanently terminating the account on receipt of additional notices.

41. Virtual Systems also had the legal right to stop the Pirate Services from infringing the Works. Virtual Systems' service agreement with its customers gives it the "right to disable any materials" and the "right to block or suspend" its service or "take any other action . . . necessary" where a customer "violates the intellectual property rights of any third party or is otherwise the subject of a dispute."[32] Virtual Systems is entitled to exercise these rights "in [its] sole discretion, immediately and without notice" to the customer.[33] Rather than exercise this right and ability to stop the Pirate Services' infringement, Virtual Systems turned a blind eye, making its servers and network a safe haven for the Pirate Services' infringement.

**Virtual Systems' Direct Financial Interest in the Infringement**

42. The Pirate Services were drawn to Virtual Systems' servers and network because it did not stop their infringement and offered to keep them anonymous. The Pirate Services perceived Virtual Systems' servers and network as a place where infringement of the Works was tolerated because Virtual Systems advertised them as such and many other Pirate Services did just that. The ongoing availability of the Works resulting from Virtual Systems' failure to take any action against the Pirate Services served as a draw for those Pirate Services to remain paying customers of Virtual

---

[32] https://vsys.host/legal/term-of-service
[33] *Id.*

Systems and attracted other Pirate Services to become paying customers of Virtual Systems.

43. Virtual Systems' pricing is based in part on the bandwidth that the customer selects, typically offered in gigabits per second (Gbps).[34] Virtual Systems, for example, charges more for a 20 Gbps server, which it recommends for "high bandwidth" applications such as "streaming [or] VOD," than it charges for a 1 Gbps server that provides less bandwidth. Virtual Systems also gives customers using certain types of servers and Xtream-UI middleware the option to purchase more bandwidth, priced per additional 1 Gbps. Virtual Systems states that "[v]ideo is driving demand for bandwidth usage, and we have it at a very competitive price."[35]

44. Virtual Systems informed customers that adequate bandwidth is "vital in ensuring fast[,] constant delivery" and encouraged them to "choose the amount of bandwidth depending on your needs."[36] On information and belief, the Pirate Services' bandwidth needs factored into their purchases from Virtual Systems, in terms of purchasing more expensive servers to acquire greater bandwidth, additional bandwidth al-a-carte, or additional servers to transmit the Works and other content. Virtual Systems refused to take any measures to stop the Pirate Services from infringing the Works because that would have worked to reduce the Pirate Services' bandwidth requirements and in turn their need to purchase bandwidth from Virtual Systems.

## Claims for Relief

### Count I

**(Materially Contributing to Copyright Infringement under 17 U.S.C. § 501)**

45. DISH repeats and realleges the allegations in paragraphs 1-44.

46. DISH is a copyright owner under 17 U.S.C. § 106 because, at all relevant times, DISH held the exclusive rights to distribute and publicly perform the Works in the United States, by means that include satellite, OTT, IPTV, and internet.

---

[34] https://vsys.host/streaming-servers
[35] https://vsys.host/xtreme-codes-panel-saas
[36] https://vsys.host/streaming-servers

Plaintiff's Complaint      14      Preg O'Donnell & Gillett PLLC
401 Union Street, Suite 1900
Seattle, Washington 98101
(206) 287-1775

47. The Works are copyrightable subject matter because they are original audiovisual works fixed in a tangible medium of expression. DISH's copyrights in the Works arise under laws of nations other than the United States that are parties to copyright treaties with the United States, including Egypt, Lebanon, Saudi Arabia, India, and Bangladesh, where the Works were authored and first published.

48. The Works constitute non-United States works under 17 U.S.C. §§ 101 and 411, and therefore registration with the United States Copyright Office is not a prerequisite to filing a copyright infringement action for the Works. Nonetheless, several Works are registered with the United States Copyright Office.

49. DISH's exclusive rights to publicly perform the Works were directly infringed by the Pirate Services' unauthorized transmission of the Works to Users. The Works were transmitted to Users when DISH's exclusive rights to publicly perform the Works were in effect.

50. Virtual Systems materially contributed to the Pirate Services' direct infringement of DISH's exclusive public performance rights by providing the Pirate Services the servers and network used to transmit the Works. Virtual Systems also offered storage servers, video encoding servers, and Xtream-UI middleware, which it marketed and sold to streaming services such as the Pirate Services as a recommended add-on to its server and network packages. On information and belief, Virtual Systems provided these additional types of servers and middleware to at least some of the Pirate Services.

51. Virtual Systems had actual knowledge that the transmission of the Works to Users infringes DISH's exclusive public performance rights and that its servers and network were being used to commit such infringement on a massive scale. The Infringement Notices informed Virtual Systems of this specific infringement, including the IP addresses and URLs that correspond with Virtual Systems' servers and network that were used to transmit the Works.

52. Virtual Systems could have taken simple measures to prevent the Pirate Services from infringing DISH's exclusive rights to publicly perform the Works, including by removing or

disabling access to the Works or terminating the Pirate Services' accounts. Virtual Systems failed to take such measures and continued to provide access to the Works.

53.     Smyrnov authorized, directed, and participated in Virtual Systems' infringement of the Works. Smyrnov managed the servers and network that the Pirate Services used to infringe the Works. Smyrnov was notified of the infringement taking place on the servers and network that he managed and he failed to stop the infringement. Smyrnov owns Virtual Systems, serves as its CEO and director, and receives direct financial benefits from its infringing acts. Smyrnov is a guiding spirit and central figure in Virtual Systems' infringement of the Works and therefore Smyrnov is personally liable for such infringement.

54.     The actions of Virtual Systems and Smyrnov were willful, malicious, intentional, and purposeful, and in disregard of and with indifference to the rights of DISH. The actions of Virtual Systems and Smyrnov are continuing with respect to many of the Pirate Services.

55.     Unless enjoined by the Court, Virtual Systems and Smyrnov will continue engaging in acts that cause substantial and irreparable injury to DISH that includes lost sales, damage to its reputation, and loss of goodwill, for which there is no adequate remedy at law.

## Count II

### (Inducing Copyright Infringement under 17 U.S.C. § 501)

56.     DISH repeats and realleges the allegations in paragraphs 1-44, 46-49, and 53.

57.     Virtual Systems provided the servers and network that the Pirate Services used to infringe DISH's exclusive rights to publicly perform the Works. Virtual Systems promoted the use of its servers and network for such infringement with its "DMCA Ignored" policy, under which Virtual Systems informed the Pirate Services that it would not comply with United States copyright law and would not take any measures to stop them from infringing the Works.

58.     Virtual Systems also promoted the use of its servers and network to infringe the Works through its "Under the Radar" policy, where Virtual Systems informed the Pirate Services

1 | that their identities will not be disclosed to copyright holders such as DISH and that no records of their infringing use of Virtual Systems' servers and networks will be kept.

59. Virtual Systems did not develop filtering tools or any other mechanisms to diminish the Pirate Services' infringement of the Works, but could have taken simple measures to stop that infringement such as by removing or disabling access to the Works or by terminating the Pirate Services' accounts. Virtual Systems failed to stop the Pirate Services' infringement of the Works because that infringement contributed to its own financial success.

60. Smyrnov authorized, directed, and participated in Virtual Systems' infringement of the Works, as explained above, and therefore he is personally liable for such infringement.

61. The actions of Virtual Systems and Smyrnov were willful, malicious, intentional, and purposeful, and in disregard of and with indifference to the rights of DISH. The actions of Virtual Systems and Smyrnov are continuing with respect to many of the Pirate Services.

62. Unless enjoined by the Court, Virtual Systems and Smyrnov will continue engaging in acts that cause substantial and irreparable injury to DISH that includes lost sales, damage to its reputation, and loss of goodwill, for which there is no adequate remedy at law.

## Count III

### (Vicarious Copyright Infringement under 17 U.S.C. § 501)

63. DISH repeats and realleges the allegations in paragraphs 1-44, 46-49, and 53.

64. Virtual Systems had the legal right and practical ability to stop or limit the Pirate Services' infringement of the Works. Virtual Systems could have removed or disabled access to the Works transmitted from its servers and network or terminated the Pirate Services' accounts and shut them down completely. Virtual Systems was authorized to take these simple measures to stop the infringement of the Works under its service agreements with the Pirate Services. Virtual Systems failed to exercise its right and ability to control the Pirate Services' infringement of the Works.

65. Virtual Systems had a direct financial interest in the Pirate Services' infringement of the Works and received direct financial benefits from such infringement. The Pirate Services were motivated to become Virtual Systems' customers because they knew that they could publicly perform the Works without interference from Virtual Systems. Virtual Systems' failure to stop the Pirate Services' infringement of the Works served as a draw for those Pirate Services to remain paying customers of Virtual Systems and attracted other Pirate Services to Virtual Systems' servers and network. By failing to remove or disable access to the Works or terminate the Pirate Services' accounts, Virtual Systems received illicit revenue that it would not otherwise have received.

66. Virtual Systems encouraged the Pirate Services to purchase sufficient bandwidth to transmit content using Virtual Systems' servers and network. On information and belief, the Pirate Services purchased this bandwidth from Virtual Systems in the form of more expensive servers, additional servers, or on an al-a-carte basis. The Pirate Services' transmission of the Works helped to keep their bandwidth needs elevated and Virtual Systems was able to sell them that necessary bandwidth. Virtual Systems did not stop the Pirate Services from transmitting the Works because it would have worked to reduce Virtual Systems' own profits.

67. Smyrnov authorized, directed, and participated in Virtual Systems' infringement of the Works, as explained above, and therefore he is personally liable for such infringement.

68. The actions of Virtual Systems and Smyrnov were willful, malicious, intentional, and purposeful, and in disregard of and with indifference to the rights of DISH. The actions of Virtual Systems and Smyrnov are continuing with respect to many of the Pirate Services.

69. Unless enjoined by the Court, Virtual Systems and Smyrnov will continue engaging in acts that cause substantial and irreparable injury to DISH that includes lost sales, damage to its reputation, and loss of goodwill, for which there is no adequate remedy at law.

**Prayer for Relief**

Judgment against Virtual Systems and Smyrnov should include:

A. A permanent injunction under 17 U.S.C. § 502 that prohibits Virtual Systems and Smyrnov, and any officer, agent, servant, employee, attorney, or any other person acting in active concert or participation with either of them, from infringing DISH's copyrights in the Works that air the Channels, including by (1) distributing or publicly performing this material in the United States, which includes streaming or transmitting the material; (2) contributing to, inducing, or failing to stop or limit the distribution or public performance of this material, which includes a prohibition on providing any servers or network used in streaming or transmitting the material and requires termination of any current or future accounts of the Pirate Services;

B. Statutory damages up to $150,000 for each registered Work infringed (including the 279 registered Works identified by example in Exhibit 1) under 17 U.S.C. § 504(c), or Virtual Systems' and Smyrnov's profits that are attributable to the infringement of those registered Works under 17 U.S.C. § 504(b);

C. Virtual Systems' and Smyrnov's profits that are attributable to the infringement of each unregistered Work under 17 U.S.C. § 504(b);

D. DISH's attorneys' fees and costs under 17 U.S.C. § 505;

E. Impoundment and disposition of all infringing articles under 17 U.S.C. § 503;

F. Pre-judgment and post-judgment interest on all monetary relief, from the earliest date permitted by law at the maximum rate permitted by law;

G. Such additional relief as the Court deems just and equitable.

Dated: October 15, 2024

**PREG O'DONNELL & GILLETT PLLC**

By: s/ Gregory Latendresse
Gregory Latendresse, WSBA # 32787
401 Union Street, Suite 1900
Seattle, Washington 98101
Tel: (206) 287-1775
Fax: (206) 287-9113
glatendresse@pregodonnell.com

**HAGAN NOLL & BOYLE LLC**
Joseph H. Boyle (*pro hac vice* forthcoming)
Timothy M. Frank (*pro hac vice* forthcoming)
Stephen M. Ferguson (*pro hac vice* forthcoming)
820 Gessner, Suite 940
Houston, Texas 77024
Tel: (713) 343-0478
Fax: (713) 758-0146
joseph.boyle@hnbllc.com
timothy.frank@hnbllc.com
stephen.ferguson@hnbllc.com

Attorneys for Plaintiff DISH Network L.L.C.